And we'll listen to, we'll hear from Ms. DeRoe, Court Appointee for James Henderson. Thank you, Your Honor. May it please the Court. I'm Elizabeth DeRoe. I represent the appellant, James Lee Henderson, in his appeal from the District Court's denial of his federal writ of habeas corpus challenging the death sentence that was imposed by the State of Texas. The issue on which the District Court granted a certificate of appealability is, has Mr. Henderson satisfied his burden under Section 2254D of showing that he is not eligible for the death penalty under Atkins v. Virginia because of his intellectual disability? I want to begin my remarks this afternoon with a focus on the standard of review and the level of deference that's appropriate to the State Court's decision in this matter. Under the AEDPA and the Supreme Court opinion in Panetti v. Quarterman, no deference is due under 2254D to the State Court decisions in this case regarding Mr. Henderson's claim of intellectual disability. The pivotal issue before the State Court was the credibility of the experts, Dr. Gilhousen for the State, vis-a-vis Mr. Henderson's expert, Susanna Rosen, who both testified regarding all three prongs of the intellectual disability test. Dr. Gilhousen's testimony was incorrect and misleading according to the State's own authority set out in the text of the book, Assessment of Children, which was admitted into evidence at the hearing. Mr. Henderson should have had the opportunity, as is required by the State's statutes, to point out Mr. Gilhousen's errors before the State Court made its credibility call. The State Court could have then weighed all of the evidence and the subsequent reviewing courts could have deferred. Do you know how that happened, Janelle? How was this sprung on you so that you did not have an opportunity to deal with the hearing? You had a hearing, right? We did have a hearing in the State trial court, in the convicting court. All right. So? We had requested in advance of the hearing to do discovery. That was denied. At the hearing, the State's expert— What were you going to discover? The basis of the expert's opinions regarding the question, the Atkins question. Did you know his opinion before the hearing? The basis of his opinion—we knew his opinion was that Mr. Henderson did not qualify as intellectually disabled. What did you not know at the first hearing that you would have addressed at the second hearing? Dr. Gilhousen testified that he was relying on a text called Assessment of Children. There's no dispute, not our expert, not the State, no one disputes that his reliance on that particular text is misplaced. The problem is he testified regarding his opinions that the reliability was the appropriate coefficient rather than the validity coefficient. In a test that had been administered to Mr. Henderson by the prison. Why wouldn't you have not known that at the time that he testified and you could have cross-examined him at that hearing? That's what I'm trying to find out. We were not— Maybe I'm not making myself clear. We were not aware that Mr.—Dr. Gilhousen's opinion was that the coefficients that governed the analysis were— Those scores were very different. It was 83 on the short-form test and 66 on the full test. We did not know before it came out of his mouth at the hearing that his position was that the short-form test reliability and validity were mixed up. And it's not that we could have known that. It was wrong. But you knew it when he testified at the hearing and you had an opportunity to cross-examine him about that at that time, did you not? Or I'm misunderstanding this. No, sir. The answer to that question is it was not apparent to us at the heat of the moment that he misstated the coefficient numbers. And then when we found out what the book said, we wanted to compare it to what he had said at the hearing because we couldn't believe that a doctorate, a Ph.D. in psychology would have mixed up those fundamental ideas about how IQ testing is done. Wasn't the book there? The book was presented to the court at the hearing. Right, so somebody could be looking it up while the other person is listening to the answers. It's possible that somebody could. No one did. The book's like over 1,000 pages, and we were not able during that short time that he was on the stand. Was there a break? Did you ask for a break? We had a short break during the hearing. It was a one-day hearing. There was a short break during the hearing, and then we went right back in. Could you please focus on the third prong, the onset before age 18, and tell us what the evidence was that helps your client to establish, to satisfy the test? Yes, sir. Because I don't see very much that's there for that and even remind us. There was evidence that Mr. Henderson was assigned to special education classes. There were two of his teachers who were personally familiar with him and taught him, one at a very young age, like age four, one in fifth grade. There were no official tests or records from that school. They had burned down, so they were nonexistent, so no written records of his intellectual testing during that period. Because the school had burned or something, is that right? That's correct. Okay. Dr. Rosen and Dr. Gilhousen both testified that IQ tests, barring some trauma or other explanation, are generally leveled throughout an individual's life. So testing post-18 will give us information regarding what that individual's IQ was prior to 18. So the testing subsequent to age 18 was evidence of what his IQ was prior to 18. There was no indication that there had ever been any trauma or any other intervening event that would have changed or made the pre-age 18 IQ separate or different. Wasn't there some testimony to the contrary also that, these are my words, that he was just kind of a normal kid? There was conflicting testimony on the issue. That's correct, Your Honor. I'll just mention that, I mean, this is just a comment on your behalf that in the Brumfield case that the Supreme Court decided this morning, they did acknowledge that assignment to special education classes could be considered. That was a Louisiana case that doesn't involve the Brasino factors, but the factors are fairly similar. Thank you, Your Honor. Do you disagree that Dr. Rosen testified that she had not seen the IQ test before he turned 18 and that to the best of her recollection, nothing in the records showed that he had an IQ below 70 prior to turning 18? Do you disagree with that part of the findings? She said she testified that to the best of her recollection, nothing showed that he had an IQ below 70 prior to turning 18. I believe that her test, and I'm not quibbling about this. I'm reading what the finding is. I'm reading straight from the finding. The testimony was that she believed he had an onset during the developmental stage because of the circumstantial evidence, and she did testify that there was no testing that was available to the court for review due to the fact that his educational records had been burned in a school fire. How do you share your case with our cases of Madam Morris and Mays? Madam Morris' facts are in very many ways similar to Mr. Henderson's facts. Yes, where you have experts, and in Madam Morris, even the experts who seemed to more uniformly agree that there was a problem, but the court held that nonetheless, the state court could use the other procedural factors, and we had to defer based upon the Mays case, which said the procedural factors still apply after our case. And we agree with all of that, Your Honor. We believe that, in fact, under Madam Morris, that Madam Morris actually informs the appropriate answer for Mr. Henderson in today's case. The reason is that the Madam Morris opinion emphasized the standard of review. The AEDPA deference to the state court decision was central to the outcome of the analysis that was conducted under 2254D2. It's our position that under Panetti that the court's appropriate analysis here is AEDPA D1, under the clearly established federal law that controls the analysis of this court. The violations of due process, including the violations of state law that occurred in this proceeding, mandates a reversal of the district court's position and a remand for an appropriate weighing of the credibility. There were two experts that were the core of the decisions that were made in this case, and the credibility decisions were made in the context of the state trial court without the procedural tools and protections that the state court was bound by under the state statutes. And because of those violations, the due process and statutory violations, this case falls under D1. It is therefore not a Madam Morris case. There is no deference due. And Mr. Henderson, under clearly established federal law under Panetti, which was decided in 2007, but the finding in Panetti was that clearly established law that they were following went back at least as far as Ford v. Wainwright, and that's 1986. So at the time of this hearing, clearly established federal law entitled Mr. Henderson to a hearing where due process is followed and those credibility determinations, and that was the focus of many of your questions when you came in today, I believe. There are contrasting evidence, contrasting opinions by experts. Somebody's got to weigh them. The person who weighed them is the federal district court or, excuse me, the state trial court that was then deferred to by the Court of Criminal Appeals, but no deference is due. No deference was due by the Court of Criminal Appeals to the state court because of the due process violations. No deference is due by the federal court to the Court of Criminal Appeals decisions because of those due process Panetti violations. If we don't find a due process violation, do we lose? If there is no due process violation, if the state of Texas can violate its own laws and protections, we are then left with deference to the Court of Criminal Appeals, and we're back under Matamoros, and we would have to do the weighing just as the Fifth Circuit did in the Matamoros case. Given what this court knows about the errors that were made by the expert that testified for the state, we believe we still should prevail because in re-weighing, given those contrasting opinions by experts, once we know one of the experts was so sloppy and so wrong, he couldn't even get the fundamental difference between validity and reliability right, then reliance on his testimony across the board becomes doubtful. Well, in that other case, though, the expert can't even be an expert anymore, and there's some evidence that the trial court continued to use some of those determinations. So I would say that that's just a layperson who's more sloppy than this case, and he still ended up deferring. The difference is that Matamoros had the opportunity to go back to the fact finder, who was weighing credibility of testimony he had heard, and when that testimony was weighed with the, I believe his name was Dinkowski, Dr. Dinkowski's opinions taken out of the equation, re-weighed, and those credibility determinations fell where they fell, and that's what this court has to defer to. The problem is there's nothing to defer here to. There's nothing to defer to here. Is there a single point of your argument today that you would like for us to carry back with us, and is there one single point in this case, or two or three, what really, in your opinion, is the strongest part of your case that ultimately will persuade us, to your point of view, from your, what is your view of that part of your case? I think that the core of our position is that 2254D1 requires the court, at every step of these proceedings, including the state trial court, all the way up to the court of criminal appeals and to the federal courts, to afford due process of law. And due process of law in this case was denied to Mr. Henderson because the state of Texas did not even give him the minimum, not that he might have or not that he could have, but that he was required to give him under Texas state statute, which is the 11071 section that we relied on in the brief. They didn't follow their law. And their law is designed to produce a truth-finding tribunal. That was not done in this case because of the weighing of the two experts. Nobody could do that because they could not do it accurately and appropriately. So the point that you say you wish us to take away from this argument is that the state court did not address the conflict between the two experts and weigh them specifically to some conclusion. The state court did weigh them, Your Honor. But the state court weighed them in the absence of due process of law that would have allowed those experts' opinions to be illuminated. And the due process of law being that you did not have a hearing or an opportunity to discover the— or to articulate the mistake that he made with respect to validity and reliability? And I haven't been articulate enough about that. The largest mistake that we see here is that after the hearing, the state court dictates our ability to review the record, a transcribed record that was due to us within 30 days that we didn't get for over a year, and to submit findings of fact and conclusions of law for the trial court to review, and we were not given an opportunity to give findings of fact and conclusions of law. So the court did it in the absence of any input from Mr. Henderson, and that's a complete violation of Texas statute. Do you have an—again, what is your best case that says that that sort of violation not only violates Texas statute but violates constitutional rights? Panetti. Panetti says that the Supreme Court is emphasizing the violation by the state of its own laws. That was the core of Panetti. And when the state is given this opportunity to structure a way to reach the truth, it then must follow those procedures, and it did not in Panetti, and it did not in this case. In Panetti, under the Supreme Court Panetti case, Mr. Henderson's case should be remanded to the district court for additional fact finding. I want to say just one other point that I want to make because I'm just about out of time here. I do want to mention that there were two amici briefs filed before this court by professional organizations who represent the scientific and clinical communities involved in the diagnosis of intellectual disabilities in our country. They are unanimous in urging this court to correct the state court's errors in reliance on Dr. Gilhousen's misleading and incorrect testimony and also the state court's conclusion of law that he knows it when he sees it, that he could diagnose Mr. Henderson's intellectual disability or lack thereof by looking at him. I'll reserve the rest of my time. Well, I mean, Potter Stewart can say it. Why can't the Texas judge say it? Well, if the Texas judge wasn't analyzing. Thank you. Okay, we'll hear from you, Mr. Frederick. May it please the court. I want to start by disagreeing with my friend's statement about what the state does and does not dispute. The state absolutely disputes their allegation that Dr. Gilhousen gave inaccurate or false testimony. He did not. Excuse me. What Dr. Gilhousen testified about was reliability. He explained a standard error of measurement and how that factors into determining a range of likely IQ based on the short-form test. That testimony is fully consistent with assessment of children. He did not mix up the concepts of validity and reliability. I'm not sure where in the record they're getting that. But all he said was this is what we get when we apply the correct coefficient, which he did, this is what we get. He did use the term reliability, though, didn't he, in his testimony? He did use the term reliability, yes. And they are arguing that he should have used the term validity at that point. I think that may be what they're arguing. It may be that they're saying he should have testified about validity, but it doesn't follow from his failure to specifically address validity that his testimony on reliability was somehow wrong. And, in fact, even if we presume that he was intending to talk about validity and not reliability, on page 241, volume 2 of the state habeas reporter's record, he acknowledged, Dr. Gilhousen acknowledged that all other things being equal, a full-scale test would be more reliable, that's what he said, more reliable than a short-form, but the short-form is still reliable enough. So even if he were supposed to testify about the comparative validity, he acknowledged that a short-form is not, as somebody else said, necessarily the gold standard. But in his professional opinion, that's good enough, it's reliable enough, and he explained exactly what it means. But, I mean, that's a little puzzling. It doesn't give you a whole lot of respect for the opinions of the testimony in this case. When one expert says an IQ of 83 and the other says an IQ of 66, I mean, why do I have to pay any attention to anybody? Why didn't that judge write and say, hey, I can look at him and tell? He knows what he's doing. Well, the reason that we can rely on the 83 score on the short-form, one, is that it is acknowledged in assessment of children and by Dr. Gilhousen to be an impressively reliable measure that is suitable for use in certain circumstances. Why wouldn't you argue that we ignore the IQ tests and go strictly to adaptability because that's an element that he's got to prove as well, and he can prove his IQ was fallacious, his IQ examinations were fallacious. But if he fails to cast any doubt on his ability to adapt in the world, he still loses, right? Absolutely. So, I mean, why are we talking about – I haven't heard a word from the petitioner here about adaptability. I don't believe I have. Well, Your Honor is certainly correct that failure to prove that the district court – failure to prove by clear and convincing evidence that the district court's factual finding about adaptive deficits was incorrect, that alone is enough to deny his petition, and he has not proven that. So you're not just leading with your worst point, possibly? No, I'm not. Because if you're leading with it's reliable across multiple illustrations, it's very different than valid to determine an individual IQ test, and you're swimming upstream against all of the experts in the field and just normal scientific – how you can use statistical data just if you know science and math. So why would you want to lead with that point if that's the hardest point of the case? I'm responding to her misstatement that we had somehow acknowledged that the testimony was false. I would respectfully disagree, however, that reliance on the short form is somehow against the overwhelming weight of scientific opinion. Do you disagree with the Texas Psychological Association's comments in that court? I don't have any reason to disagree with the statement of whomever made that statement, but as a legal matter, it has not been established by this court or the Supreme Court that short form IQ tests are invalid. And so to the extent, even if we assume that it was somehow improper to give that any weight, he cannot overcome AEDPA's relitigation bar because that did not violate clearly established law. Can you talk to the fact that they didn't give the transcript? That's really troubling. I don't know why they didn't give him the transcript for so long, nor do I – I don't understand why the state trial court did what it did. However, failure to comply with the letter of state process does not equal a due process violation. In this case, it certainly does not because he got a hearing where he was allowed to put on his own testimony by experts. He was allowed to cross-examine the state's experts. That takes him out of Panetti. Panetti had no chance to present experts. The trial court, the state court relied entirely on the state's experts. When did they get the trial transcript? A year after the testimony? Approximately a year, correct. And that was after the state trial court had ruled on the habeas petition? That's correct. And had the other side submitted findings in the meantime? No. Their position is they did not get the chance to submit proposed findings, although there is no evidence in the record that anyone submitted proposed findings. And I should point out too that there is evidence in the record that Mr. Henderson was able to file objections to the trial court's proposed findings of fact and conclusions of law before the Court of Criminal Appeals made the ultimate determination, which is its determination to make, not the trial court's. So that is the relevant decision maker. So this is different than most of these cases where the state just submits a bunch of proposed findings and they're adopted at the end or later. This is different than that situation? It is different, but even that situation would not necessarily be a due process violation. I know it's not, but that's the normal thing that happens. That's correct. And because he had the text that he complains about, there being some gap between the testimony and the source, he had the ability, as he did, to object to the proposed findings of fact. What is the bottom line prejudice they claim as a result of not getting the transcript until after the court had ruled? As I understand their argument, their complaint is that they didn't get the transcript, and because they didn't get the transcript, they weren't able to prepare their own proposed findings of fact and conclusions of law for the trial court to consider. But nobody did, so it doesn't really matter. The trial court did those on its own. That's right. That's your position. That's our position, and the more important position is that Panetti, nothing in Ford or Panetti establishes a constitutional right based on the due process clause to submit proposed findings of fact or even to cross-examine witnesses. In fact, in Panetti, the Supreme Court expressly reserved any opinion on whether due process under Ford would require the ability to cross-examine witnesses. He got everything due process required, and so there is no basis for his argument that the state court unreasonably applied clearly established law. Its decision, the process it gave him, was fully consistent with Panetti and Ford. So this is the transcript of the habeas procedure? Correct, Your Honor. All right, and neither side got it? Neither side got the transcript? That's correct. As far as the record? As far as the record shows, yes. There's no allegation that the state got it, but they didn't. So I want to move on. I guess the argument is that they could have changed the district court's mind if they had had the transcript, but they were a participant in the trial that the transcript reflected. Is that true? That is correct, Your Honor. So they knew everything that went on or should have known. That's right. Were there objections made? When the time for objections, there were objections made, right? Oh, yes. And were any of those adopted and sustained? Well, there were objections in the state habeas trial court to all of Dr. Gilhousen's testimony. I'm talking about after the findings came out and there's a chance to say, oh, we don't think these are correct. Did the district court go back and say, the trial court go back and say, oh, okay, we looked at that and I'm going to amend those? No. No, there's no indication in the record that that happened. Did any of them get changed? Well, no, one did get changed. The trial court made a factual finding. It was number 21. And this was about a pre-conviction full-scale IQ test that had been administered under the supervision of a Dr. Hickman. And there was testimony that the individual who administered that test didn't have a license at the time. And so the court of criminal appeals expressly refused to adopt that finding. But I'm not talking about the court of criminal appeals. I'm talking about when it was submitted to the trial court, any objections submitted to the trial court after the fact, since it didn't get pre-submitted. Did the trial court change its views on anything? The answer is no. And I was unclear. The objections were submitted to the court of criminal appeals. So nobody submitted anything to the trial court for reconsideration? Not as far as the record shows, Your Honor. Okay. I'm sorry. I guess I'm wrong on that. No. Could you go through the factors on adaptive behavior to tell us what you say the evidence established and maybe opposing counsel can counter with her view of that for us? Of course. To begin, on the adaptive behavior deficits, Mr. Henderson's position for this court is essentially that there are certain facts in the record that are not inconsistent with mental retardation. But to overcome the relitigation bar, he must show that the facts aren't consistent with any other conclusion and that no reasonable person could fail to reach that conclusion, that he is retarded. Now, as for the factors, the bulk of the evidence on adaptive deficits that appears in the transcript of the state habeas court is from people who knew Mr. Henderson when he was a child. Now, only one of those individuals, Mr. Milton Glass, suggested that he thought when Henderson was a child that he was mentally retarded. He then testified, however, that some of the factors that Mr. Henderson relies on, such as dressing in an age-appropriate manner, Mr. Glass himself said, well, I thought that was more from neglect. And there is extensive testimony that Mr. Henderson grew up in an impoverished household. They lived in a two-room house. His mother didn't have a job and had a lot of kids. And so the facts that Mr. Henderson now points to to say, well, these are indications of mental retardation are just as indicative of neglect and poverty. It's also important, however, that the other witnesses who knew Mr. Henderson as a child said that they didn't think he was mentally retarded when they were children. Altice Rutherford said nobody referred to him that way when he was a child. And Ms. Craya Imsen, his probation officer who knew him when he was a teenager, she said that as far as she knew, by the time he was a teenager, these problems about smelling bad and dressing inappropriately had gone away. She said, whenever I saw him, he was clean, neatly dressed. He was a nice young man. Same goes for the Texas Ranger who interviewed him. He said, based on my interview, no indication that he had a severe mental deficit. There's also testimony at the punishment phase of his trial that's consistent with this from more people who knew Mr. Henderson when he was a child. Ms. Barbara Ann Griffin said she knew him for most of his life. He even lived with her for a year when he was about 19 or 20. And she said her son was like a big brother to Henderson. He helped out around the house. He brought money in when he could. And she agreed. He's not stupid. And there was nothing that would have prevented him from continuing in school and graduating from high school. But he just didn't do it. That's 17 of the state reporter's record at 3350. Ms. Clara Murphy knew him all his life. She testified about his mother wasn't always able to provide food and clothing. And his own mother confirmed that. Confirmed that Mr. Henderson left school in 10th grade. Confirmed that he had trouble in school. So to the extent that he has demonstrated some inability to perform academically, there is substantial evidence in the record that would support the state court's conclusion that this was not the result of an inherent intellectual disability. And there's certainly nothing in the record that's sufficient to establish by clear and convincing evidence that the state court's conclusion was incorrect. I would also point out that to the extent that there was some indication of inadequate academic performance, there was also contrary evidence. When he was in jail, he had betting slips that showed that he was tracking college and professional football games, recording bets, saying who won and who lost. He had upwards of 40 books, I think, in his cell. The indication is that he's able to read what we might think of as airport novels like Tom Clancy and Stephen King, John Grisham. Were there also commissary records indicating calculations and neatness and that kind of thing? That's correct. There are commissary request slips showing that he's able to perform calculations of when you order five of something that costs 40 cents, then it's $2, things like that. Because that is in the record, that is sufficient to defeat Mr. Henderson's argument that the evidence is so clear and convincing that the state court just got it wrong beyond question. On the final prong, the onset before age 18, other than the equivocal evidence of how he performed in school and how he appeared, there's just no evidence that he had an onset of an intellectual disability that would be recognized by Atkins before age 18. The most that Mr. Henderson has been able to put forward is that there's no reason to think he wasn't. There's no reason to think that it didn't onset before age 18. That assumes, of course, that he has an intellectual disability, but that is not affirmative evidence and it's certainly not enough to prove by clear and convincing evidence that the state court got it wrong. Can you go back over what discovery, I guess discovery is denied, but how it would have been for him to know about the book and be able to compare any of the materials that the expert relies on? It seems like in a complicated case you'd be able to get the information ahead of time. Well, two responses to that, one factual and one legal. The factual response is the suggestion that Mr. Henderson tried and was prevented by the state court from getting discovery of Dr. Gilhousen is not supported in the record. His discovery request, it was a motion for continuance and for discovery. What he asked for were subpoenas for lay witnesses who were outside the state of Texas and an authorization and funding for an MRI of Mr. Henderson. That motion doesn't mention expert testimony or Dr. Gilhousen. So it wasn't an RFP for things that the expert relied upon to produce and bring those? No, and the portion of the record that he cites, it contains exactly what I've just said. It doesn't talk about Dr. Gilhousen, and he hasn't pointed to any other portion of the record. I haven't seen any where there was a pre-hearing discovery request related to experts. To move to the legal issue, even if he had requested give me the expert report, let me depose your expert, had the state court denied that request, that would not establish a violation of due process. Because under Ford and Panetti, they do not establish a constitutional right to pre-hearing discovery at all, much less of an expert. And so to take it a step further back, even if the court could conclude that, well, in these circumstances, yes, we think this amounts to a violation of due process. That's not enough to get him over at his re-litigation bar, because the clearly established law comes from Ford and Panetti. And neither of those cases clearly establishes a right to pre-hearing discovery. You may not have had a chance to look at the Supreme Court's opinion today, but you haven't? I have not. I'm sorry, I was told about the Walker case, but not the other one. One final factual issue that I just want to clear up is the caveat about short-form tests that Mr. Henderson relies on. That relates to the WAIS-3, which is not the test that Dr. Gilhousen testified about. That test, as Mr. Henderson's own post-trial submission at the Record on Appeal 940, as his expert concedes, the test that Dr. Gilliland administered and Dr. Gilhousen discussed contains no such caveat, no instruction that you shouldn't use this for legal proceedings. It says that it's preferable to use full-scale for a clinical placement, but that focus is simply misdirected. So if there are no further questions from the Court, I just urge that the District Court be affirmed. Okay, thank you, Mr. Frederick. What do you have to say about the adaptive features of the case? The adaptive functions deficits testimony that is in the record by Dr. Rosen is that she administered the Vineland scales test, which is designed for analyzing an individual's adaptive function deficits, and she reviewed some old tests, some of which were administered before Mr. Henderson turned 18. She made specific findings that he had adaptive function deficits in the specific areas of self-direction, academic skills, work, and safety. How does that compare to the testimony of those who knew him at the time and made personal observations of him with respect to his adaptive capabilities? The individuals who testified, with the exception of his probation officer when he was 15, their testimony was completely consistent with Dr. Rosen's professional conclusions after the testing. That is that he had adaptive function deficits, and they didn't phrase them in the clinical language that Dr. Rosen used, but they described their experiences with him. His teachers described their experiences with him. His classmates described their experiences with him. They described an individual who was delayed academically and socially in functioning as an individual in the society and in the community where he lived. It's completely consistent, other than the testimony of the state's probation officer who met with him in a series of meetings, one hour each, but was unable to remember how many times she had met with him. Her testimony was he was a good-looking man, he was a neat man, and he was capable of writing a letter, none of which is inconsistent with the professional clinical findings of Dr. Rosen. Her analysis of his deficits did not preclude him from doing the functions that he was capable of, and the fact that he was capable of some functions is not evidence that he lacked deficits in other functions. The other evidence in the record is the trial court's record of the facts surrounding his crime, and this court probably recalls those, but when the offense happened, the individuals who were his co-defendants and Mr. Henderson left the victim's residence in the resident's car, stole her car, got to Dallas, he had the murder weapon in his pocket, they put him out because of a dispute, he called the police and reported that those other individuals had stolen his car and asked the police to come and help him recover the stolen car from his co-defendants while he had the murder weapon in his pocket. I'd say that is a very strong argument for a lack of absence of adaptive skills to have called the police that somebody was stealing the car that he stole and asked them to help him. Yes, sir. I want to say one other thing about the nature of the record where we find ourselves, and that is that the state had not had the opportunity to review the transcribed record and had not had the opportunity to propose findings of fact and conclusions of law. Just to be clear, the record is silent on that. We do not know when the state got the transcription or whether they submitted findings of fact and conclusions of law. My point only is that we don't know the record is silent. The objections that you were asking about that were filed, they specifically said, we are filing these objections because we received the court's findings of fact and conclusions of law. That site, record site to the transcript, and to this day we still do not have the transcript. Those objections were filed in the absence of receiving the transcript. And they were filed with the Court of Criminal Appeals? Yes, they were. Was it past the time to file them in the trial court? Yes. Or why weren't they filed there? Because the findings of fact and conclusions of law had been submitted to the Court of Criminal Appeals at that point.  We still didn't have the transcript. It turns, again, to whether or not evidence of evidence applies. I agree with you. If the evidence could go completely with Dr. Rosen, you could put it all in. If I were here and I assume Archimando, I could see it that way. But if it's succeedingly subjective and there's some little bits here and there that go the other way, you don't win, do you? I think we do because the court, the individual who was tasked with making that exceedingly subjective decision, had to make credibility choices. If he knew that Dr. Gilhousen's testimony regarding reliability and validity were incorrect, if he had the opportunity to examine Dr. Gilhousen's testimony within the appropriate framework and then compare it to the contrasting evidence, both of the facts regarding the crime, the evidence of the facts around the crime, the professional testing, the prior testing, and all of the clinical information that Dr. Rosen had, somebody has to weigh that credibility. And that credibility has to be weighed in the context of a proceeding where due process gave both sides the opportunity to develop the facts. Because that's absent. We don't go back and defer to that proceeding or to that finding. Focusing on the 2004 IQ test in which Mr. Henderson scored a 66, could you speak to the absence of any effort testing there? Just to make sure I understand your question. Am I correct? There was no effort testing as to that to see whether he was malingering on the test. Dr. Rosen did testify that she had tools that she used to determine whether or not he was malingering on that test, and she determined that he was not. I think it's also very telling that Dr. Rosen's conclusions regarding his abilities actually showed him to have better abilities than some of his previous tests. So he wasn't just in a sense making up wrong answers to avoid the death penalty, because he understood that mental retardation would allow him to escape this punishment. He performed on these tests in some ways, according to Dr. Rosen's clinical analysis, better than he had performed on previous tests. The 66 IQ was based on all of those clinical tests that allowed her to test for malingering. That's part of what she does in her testimony. She sets out the idea that there are tools to determine that. She used them, and she determined that he was not malingering. That's her testimony. Does that complete your argument? It does, Your Honor. Okay. Well, thank you very much for your argument. Thank you. I appreciate the arguments that the state has made and the arguments that you've made. We'll assist the court in coming to some resolution about this case. Thank you, and you'll hear from us in due course. This case is recorded and adjourned.